UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER GILLEN,

        Petitioner,                                     Hon. Wendell A. Miles

v.                                                          Case No. 1:04-CV-132

KENNETH McKEE,

        Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Gillen's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Gillen's petition be **denied**.

**BACKGROUND**

        In the spring of 2000, Petitioner moved in with Helen Dalton. (Trial Transcript, December 12, 2000, 34, 59). At the outset, the relationship between Dalton and Petitioner was "good," but the pair soon began fighting frequently. (Trial Transcript, December 12, 2000, 36-37, 40-41, 109-11, 128; Trial Transcript, December 13, 2000, 23-26). As Dalton's son, Johnny Williams, described it, these fights got "worser and worser." (Trial Transcript, December 12, 130). Williams described one fight between his mother and Petitioner concerning drugs. *Id.* at 128-29, 134-36. Petitioner was "cussing"

and repeatedly asking Dalton, "where's my shit?" Dalton told Petitioner that she "flushed it," to which Petitioner responded, "you better find my shit." *Id.*

On or about Memorial Day 2000, Petitioner began asking where he could obtain a gun. (Trial Transcript, December 13, 2000, 50-51). Petitioner's efforts proved successful, as he subsequently obtained a .357 magnum handgun which he showed to several people and successfully used to shoot raccoons. (Trial Transcript, December 12, 2000, 71-72, 101, 136-39; Trial Transcript, December 13, 2000, 33, 39-42).

Dalton's family and friends subsequently learned that Petitioner was abusing and physically assaulting Dalton. (Trial Transcript, December 12, 2000, 37, 141-43; Trial Transcript, December 13, 2000, 25-26, 52-53). When Helen Dalton's brother, Freddy Dalton, spoke with Petitioner about the matter, Petitioner told Freddy that Helen "done something three times, and I told her not to do it, so I had to do what I got to do." (Trial Transcript, December 13, 2000, 49). When Freddy asked Petitioner if he would like it if he physically assaulted Petitioner's sister, Petitioner stated that "I don't care because they're crack heads." *Id.* at 50. When Freddy Dalton reiterated his desire that Petitioner not assault his sister, Petitioner repeatedly told Freddy that "I'm going to do whatever I got to do to take care of me." *Id.*

In late July 2000, one of Helen Dalton's neighbors, Shaunika Spicer, witnessed an argument between Dalton and Petitioner. (Trial Transcript, December 12, 2000, 66-67). Dalton told Petitioner, "[s]ince I'm not making you happy, why don't you find somebody to make you happy." *Id.* at 66. Petitioner responded, "God knows I'm trying because I'm getting tired of your black ass." *Id.* at 66, 96. Dalton also told Petitioner that she "don't want no alcoholic," to which Petitioner retorted, "don't nobody want any crack head." *Id.* at 67. Dalton replied "that's why you got to have smoking crack,"

to which Petitioner responded by calling Dalton a "bitch," "a trick," and "a whore." *Id.* at 67, 86. Petitioner later told Spicer, "I can't stand that bitch, that trick." *Id.* at 67. Dalton told her daughter that she wanted Petitioner "to leave." *Id.* at 116-17.

On July 28, 2000, Dalton "packed up" Petitioner's things. *Id.* at 91-92. Dalton was excited, stating that "I'm glad he's going to move, I'm glad he's going to go." *Id.* at 92-93. Petitioner, on the other hand, was "cussing" and stated to Shaunika Spicer, "[y]eah, I want to see this bitch make it on her own." *Id.* at 93. Later that afternoon, Spicer, who shared a duplex with Dalton, heard an argument coming from Dalton's bedroom. *Id.* at 63, 91. Spicer heard Petitioner call Dalton a "bitch" and a "whore," immediately after which she heard two loud bangs against the wall. These impacts against the wall were strong enough to knock a picture off the wall of Spicer's residence. *Id.*

Later that evening, Helen Dalton was shot in the face with Petitioner's gun. (Trial Transcript, December 13, 2000, 67-77, 84-87, 91-95, 103-10, 114-20, 137-38; Trial Transcript, December 15, 2000, 18-22). When the police officers arrived at Dalton's residence, Petitioner asserted that he had been outside the residence talking to Lawrence Abney when he heard gunshots. (Trial Transcript, December 13, 2000, 94, 108-09; Trial Transcript, December 15, 2000, 64; Trial Transcript, December 18, 2000, 11-12, 17).

Petitioner claimed that immediately after hearing gunshots he ran inside and gave Dalton mouth-to-mouth resuscitation. (Trial Transcript, December 13, 2000, 94-95). However, despite the fact that Dalton's face was covered in blood, officers observed no blood on Petitioner's face or mouth. (Trial Transcript, December 13, 2000, 73, 87, 93, 107, 117-18). Petitioner asserted that he did not own a gun and, moreover, had never even seen the gun with which Dalton was shot. (Trial Transcript, December 13, 2000, 93-94, 110; Trial Transcript, December 14, 2000, 111-13). Petitioner claimed that Dalton

committed suicide. (Trial Transcript, December 13, 2000, 107-08; Trial Transcript, December 14, 2000, 113). This claim, however, was dismissed by Dr. David Start, the forensic pathologist who performed the autopsy on Dalton's body. (Trial Transcript, December 14, 2000, 75-76). According to Dr. Start, the shot which killed Dalton was fired from in front of her body from a range of 36 inches. (Trial Transcript, December 14, 2000, 38-41, 56-59; Trial Transcript, December 15, 2000, 35-38).

After asserting that Dalton had committed suicide with a weapon he had never seen before, Petitioner agreed to "be honest" and offered a different version of events. (Trial Transcript, December 14, 2000, 114-15). In this version of events, Petitioner claimed that the weapon accidentally discharged while he was attempting to unload it. *Id.* at 116. Petitioner asserted that he was handling the gun because he was going to sell it to Lawrence Abney. (Trial Transcript, December 18, 2000, 17, 28). Lawrence Abney, however, denied ever talking with Petitioner about buying a weapon. (Trial Transcript, December 19, 2000, 6-7). Furthermore, a forensics expert testified that Petitioner's gun possessed a built-in safety mechanism which prevented it from firing unless pressure is applied to the trigger itself. (Trial Transcript, December 15, 2000, 30-35).

Following a jury trial, Petitioner was convicted of: (1) second degree murder; (2) being a felon in possession of a firearm; and (3) possessing a firearm during the commission of a felony. (Trial Transcript, December 19, 2000, 90-91). Petitioner was sentenced to 24-45 years for second degree murder, 5-10 years (to be served concurrently) for being a felon in possession of a firearm, and two years (to be served consecutively) for possessing a firearm during the commission of a felony. (Sentencing Transcript, February 1, 2001, 6). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

> I.   Defendant was convicted on the basis of improper and highly prejudicial "other bad acts" evidence, where the

>
> prosecutor elicited testimony that Defendant was previously convicted of careless discharge of a firearm involving the shooting of an 8 year-old girl, and where the prosecutor later accentuated the improper evidence during his closing argument to the jury.
>
> II. Trial counsel was ineffective for failing to obtain the services of a firearms expert at a trial where the crux of Defendant's case was that a gun accidentally discharged killing the complainant, and where the prosecutor presented expert testimony that the gun could not have fired accidentally.
>
> III. The prosecutor committed reversible error by appealing to the jurors' sympathy for the decedent's young child, by improperly questioning his witness, by arguing facts not in evidence, and by exposing the jury to evidence and argument concerning Defendant's parole status.

The court of appeals affirmed Petitioner's conviction. *People v. Gillen*, No. 232865, Opinion (Mich. Ct. App., November 12, 2002). Asserting the same issues, Petitioner moved the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal. *People v. Gillen*, No. 122791, Order (Mich., May 30, 2003). On February 25, 2004, Petitioner initiated the present action in which he asserts the following claims:

> I. Petitioner was convicted on the basis of improper and highly prejudicial "bad acts" evidence, where prosecutorial misconduct denied Petitioner his federal constitutional right to a fair trial, where the prosecutor elicited testimony that Petitioner was previously convicted of careless discharge of a firearm involving the shooting of an 8 year-old girl, and where the prosecutor later accentuated the improper evidence during his closing argument to the jury.
>
> II. Petitioner was denied his state and federal constitutional right to the effective assistance of counsel where counsel failed to obtain a firearms expert at a trial where the crux of the case was that a gun accidentally discharged, and

       where the prosecutor presented expert testimony that the gun could not have discharged accidentally.

  III.    The prosecutor committed reversible error by appealing to the jurors' sympathy for the decedent's young child, by improperly questioning his witness, by arguing facts not in evidence, and by exposing the jury to evidence and argument concerning Petitioner's parole status.

## STANDARD OF REVIEW

Gillen's petition, filed, February 25, 2004, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

  (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

      (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

      (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant

state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.  **Evidentiary Claim**

Petitioner asserts that his constitutional right to a fair trial was violated by the improper admission of prior bad acts evidence regarding his previous conviction for careless discharge of a firearm causing injury.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not "require a perfect trial," *Clemmons*, 34 F.3d at 358, and, moreover, courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* As is well recognized, however, the United States Supreme Court has never held that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bugh*, 329 F.3d at 512-13; *Hester v. Booker*, 2006 WL 1555972 at *4 (E.D. Mich., June 2, 2006). As noted above, in the absence of Supreme Court authority holding that the admission of evidence of prior bad acts violates the Constitution, laws, or treaties of the United States, Petitioner is not entitled to

habeas relief. *Bugh*, 329 F.3d at 512-13; *Hester v. Booker*, 2006 WL 1555972 at *4 (E.D. Mich., June 2, 2006). Accordingly, this claim raises no issue upon which habeas relief may be granted.

### II. Ineffective Assistance of Counsel Claim

Petitioner asserts that the "crux" of his defense was that the gun used to kill Helen Dalton accidentally discharged and that, therefore, no reasonable juror could have found him guilty of second degree murder. To apparently counter this anticipated defense, the prosecution secured the testimony of a forensics expert who testified that Petitioner's gun possessed a built-in safety mechanism which prevented it from firing unless pressure is applied to the trigger itself. Petitioner asserts that his trial counsel rendered constitutionally ineffective assistance by failing to secure the testimony of a forensics expert to support Petitioner's defense theory.

To establish that counsel's performance was constitutionally deficient, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688.

Petitioner must further establish that counsel's performance was prejudicial in that it denied him a fair trial. *Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so <u>manifestly</u> ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

In rejecting Petitioner's ineffective assistance of counsel claim, the Michigan Court of Appeals correctly observed that "[t]here is nothing in the record presented to indicate that any firearms expert would have testified favorably to defendant." *People v. Gillen*, No. 232865, Opinion at 3 (Mich. Ct. App., November 12, 2002). Accordingly, the court denied Petitioner's claim because he could not demonstrate that he had been prejudiced by his counsel's alleged deficiency. *Id.* The Court further notes that even if the evidence that Petitioner's weapon could not have accidentally discharged is disregarded, the evidence against Petitioner was simply overwhelming.

The Michigan Court of Appeals determined that this particular claim was without merit. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

### III.     Prosecutorial Misconduct Claims

Petitioner also asserts that the prosecutor violated his right to a fair trial by appealing to the jurors' sympathy for one of Helen Dalton's children, arguing facts not in evidence, and introducing evidence (and subsequently arguing) that Petitioner was on parole at the time of Helen Dalton's killing. Petitioner has procedurally defaulted these claims, however, precluding their consideration by this Court.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims on the merits because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground

precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

To find that a petitioner has procedurally defaulted a particular claim, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). Furthermore, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish the existence of cause and prejudice for his procedural default, or if a fundamental miscarriage of justice would result from the failure to grant the relief he seeks. *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991); *Coleman*, 501 U.S. at 750-51; *Silverberg v. Evitts*, 993 F.2d 124, 127 (6th Cir. 1993); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish that a miscarriage of justice would result

from the Court's failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). The burden to make this showing rests with Petitioner, *see Floyd v. Alexander*, 148 F.3d 615, 618 (6th Cir. 1998); *Mitchell v. Rees*, 114 F.3d 571, 577 (6th Cir. 1997), who must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error probably resulted in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326. This requires Petitioner to overcome a hurdle higher than that to establish prejudice. *Id.*

Petitioner acknowledges that he failed to contemporaneously object to the items at issue. The Michigan Court of Appeals, the only court to address this issue, declined to address the merits of these claims because of Petitioner's failure to comply with Michigan's contemporaneously objection rule. *People v. Gillen*, No. 232865, Opinion at 3 (Mich. Ct. App., November 12, 2002). Instead, the court simply reviewed the matter to determine if its failure to review Petitioner's claims would result in a miscarriage of justice. *Id.* The court concluded that "a miscarriage of justice will not result from our failure to review this unpreserved issue." *Id.* at 4.

Petitioner has failed to demonstrate cause for his procedural default or prejudice resulting therefrom, nor has he established that a miscarriage of justice would result from the failure to evaluate these claims. Thus, the Court is prevented from addressing Petitioner's prosecutorial misconduct claims. However, even were the Court to address these issues, the result would be the same as these claims are without merit.

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct was "so egregious so as to render the entire trial fundamentally unfair." *Id.* When a federal habeas court considers the extent of any prosecutorial misconduct, the following factors are to be considered:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.* at 1355-56.

In his opening statement to the jury the prosecuting attorney stated, "[o]n the date of July 28th of 2000, Stacey Williams, the nine-year-old daughter of Helen Dalton, saw her mother for the last time, bleeding and fighting for her life." (Trial Transcript, December 12, 2000, 3). Petitioner asserts that this statement represents an attempt by the prosecutor to improperly elicit sympathy for the victim's daughter. Petitioner asserts that this statement deprived him of the right to a fair trial. As the Michigan Court of Appeals correctly stated, this remark "was a proper comment regarding the evidence the prosecutor intended to present. This comment was not a blatant appeal to the jurors' sympathy and was not so inflammatory that defendant was prejudiced." *People v. Gillen*, No. 232865, Opinion at 3 (Mich. Ct. App., November 12, 2002).

In his closing argument to the jury, the prosecutor stated, "[i]n fact, the police found her how? Face down. Why? Because he wanted her to die." (Trial Transcript, December 19, 2000, 46). Petitioner asserts that this statement "violated the long-standing principle that an attorney may not argue

or refer to facts not of the record." First, the prosecutor's statement was not inconsistent with the evidence presented. The first officer to arrive at the scene testified that Helen Dalton's "face was laying on the floor, and that was laying in a pool of blood." (Trial Transcript, December 13, 2000, 74). Moreover, the prosecutor's comment that Petitioner wanted Dalton to die was a proper response to the assertion (unsupported by the evidence) that Petitioner attempted to save Dalton's life by administering mouth-to-mouth resuscitation. As the Michigan Court of Appeals correctly concluded, the prosecutor "was arguing the evidence and the reasonable inferences from the evidence." *People v. Gillen*, No. 232865, Opinion at 3-4 (Mich. Ct. App., November 12, 2002).

Finally, the prosecution presented evidence that Petitioner was on parole at the time he murdered Helen Dalton. Petitioner asserts that introduction of such "prior bad acts" evidence denied him the right to a fair trial. First, as discussed above, the introduction of allegedly prior bad acts evidence is not a basis on which habeas relief may be granted. Moreover, the Court finds nothing improper with the introduction of this evidence.

One of the officials with whom Petitioner spoke following Dalton's killing was his probation officer, Steve Johnson. (Trial Transcript, December 14, 2000, 90-135). Johnson testified that upon learning of Dalton's killing and the circumstances thereof, it was necessary to meet with Petitioner to determine if he had committed a violation of the conditions of his parole. *Id.* at 110-12. When confronted by Johnson, Petitioner initially reiterated the version of events that he had offered immediately following Dalton's murder, namely that Dalton had shot herself with a weapon the identity of which he was completely unaware. *Id.* at 112-14. However, after presenting this particular version of events, Petitioner told Johnson that he would now "be honest" and relate why really happened. *Id.* at 114-15. As noted above, Petitioner then told Johnson that the weapon accidentally discharged while

he was attempting to unload it. *Id.* at 116. Petitioner told Johnson that he initially lied to both the police and Johnson because he did not want to be charged with a parole violation for possessing a weapon. *Id.* at 129-30.

In light of Petitioner's proffered rationale for initially lying to the police and Johnson, Johnson's status as a parole officer, as well as Petitioner's status as a parolee was certainly relevant. Moreover, because Petitioner was also charged with being a felon in possession of a firearm, evidence regarding his previous conviction was relevant. As the Michigan Court of Appeals correctly observed, Petitioner has presented no evidence that the prosecutor introduced the evidence in a deliberate attempt to deny Petitioner of the right to a fair trial. *People v. Gillen*, No. 232865, Opinion at 4 (Mich. Ct. App., November 12, 2002). Moreover, even if the Court assumes that the prosecutor's statements were improper, any prejudice resulting therefrom "could have been cured by a timely objection and curative instruction." *Id.* Finally, the Court again notes that the competent evidence of Petitioner's guilt was simply overwhelming. Accordingly, these claims present no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Gillen's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                            Respectfully submitted,

Date:  October 5, 2006                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge